United States Court of Appeals
For the First Circuit

No. 97-2190

MICHAEL F. TERRY,

Plaintiff, Appellant,

v.

BAYER CORPORATION and
BAYER CORPORATION DISABILITY PLAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch, Circuit Judge, 

Coffin and Bownes, Senior Circuit Judges.

James B. Krasnoo, with whom Richard Briansky and Law Offices
of James B. Krasnoo, were on brief, for appellant.
William J. Klemick, with whom John J. Myers, Treazure R.
Johnson, and Eckert Seamans Cherin & Mellott, LLC, were on brief,
for appellees.

May 27, 1998

BOWNES, Senior Circuit Judge. In this appeal under the
Employee Retirement Income Security Act of 1974, as amended, 29
U.S.C.A. 1001 - 1461 (West Supp. 1998)("ERISA"), appellant
Michael F. Terry challenges the termination of his long-term
disability benefits. The district court granted summary judgment
to the defendants. We affirm.
I.
As required under the summary judgment standard, we
recite the following undisputed facts in the light most favorable
to the non-movant Terry, drawing all reasonable inferences in his
favor. August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st 
Cir. 1993).
Terry began working at Bayer Corporation ("Bayer") in
1982 as a computer software test auditor. At some point during
the course of the next several years, Terry was moved to a new
position, involving the tracking of rejected computer materials,
and reporting his findings to the Bayer engineering and purchasing
departments. 
On or about January 5, 1987, as he exited his apartment
building on the way to work, Terry slipped on ice and fell down
nine steps, injuring his knee. He continued on to work that day,
but on arrival was sent to the hospital by Bayer's nurse. Over the
course of the next several weeks, Terry was cared for by both his
primary care physician, Dr. Walter H. Jacobs, and an orthopedic
surgeon, Dr. George Ousler. Dr. Ousler determined at the time that
Terry most likely had suffered a "medial lateral collateral
ligament injury strain or an internal derangement of the knee."
While Dr. Ousler's treatment plan was originally conservative, in
March, 1987, Terry underwent arthroscopic surgery in an attempt to
remedy persistent soreness and slight swelling. Pain management
and physical therapy ensued for the next several months.
Terry returned to work in August 1987. He was promoted
in 1988 to a position maintaining desk-top computers. In January
1990, as a result of budget cuts, Bayer transferred Terry to the
position of test technician. This position involved the assembly
and testing of computer boards, and involved considerably more
physical activity than his previous positions; Terry was now
required to move containers of computer boards around the
workplace. After having been in his new position for approximately
one month, Terry's knee buckled and he fell to the ground. This
incident occurred outside of the workplace.
As a result of this second injury, Terry did not return
to work at Bayer. A second arthroscopic surgery was soon
performed, and torn cartilage and bone chips were removed from his
knee. 
Terry's primary care physician, Dr. Jacobs, states that
Terry suffers from a degenerative knee condition which results in
bone-on-bone contact. As a result of the condition, Terry is in
almost constant pain, and is unable to stand, sit, or otherwise
maintain a single stationary position for any extended period of
time. Dr. Jacobs treats Terry's pain with a variety of anti-
inflammatories and painkillers. 
In July, 1990, Bayer approved Terry's application for
long-term disability benefits. The Summary Plan Description
("SPD") states that long-term disability benefits are provided
under the Bayer Long-Term Disability Plan ("Plan") when a
beneficiary is "unable to work at any job for which [they] are
qualified by education, training, or experience."
As Plan Administrator, Bayer retained Northwestern
National Life Insurance Company ("Northwestern") to process and
manage claims made under the Plan. As part of that service,
Northwestern assigned Anne Tacl to Terry's case to serve as
rehabilitation case manager. Tacl's job was to monitor Terry's
medical condition in order to make sure that he continued to meet
the Plan's definition of total disability. Tacl was also charged
with attempting to rehabilitate Terry, with the goal of returning
Terry to full-time employment. These responsibilities were
consistent with Plan provisions. Because Tacl was based in
Minnesota, Tacl hired Sandy Lowery to provide local rehabilitation
services to Terry. 
In April, 1991, Tacl received a report from a Dr. Zarins,
an orthopedic surgeon whom Terry had consulted prior to the active
involvement of Northwestern. That report opined that Terry's
accounts of pain did not correspond to the pathology observed in
his knee. Dr. Zarins stated that Terry could return to part-time
work with certain significant restrictions. Northwestern, however,
was unable to locate an appropriate job for Terry at Bayer. Dr.
Zarins saw Terry again one year later, in April 1992, and again
determined that Terry could perform sedentary work on a part-time
basis. Dr. Jacobs, for his part, however, continued to insist that
Terry was completely disabled. 
In November of 1992, Tacl, as authorized by the Plan,
scheduled an independent medical evaluation ("IME") in an attempt
to resolve the conflicts in medical opinion. The IME was performed
by Dr. Thomas King, who determined that Terry's pain was "out of
proportion to all physical findings," but wanted to rule out
"reflex sympathetic dystrophy" ("RSD"). Terry was referred to
another specialist, who determined that Terry was not suffering
from RSD.
On the basis of these medical evaluations, Tacl decided
that Terry should participate in a work-hardening rehabilitation
program, with the goal of returning Terry to full-time employment. 
Terry was informed, pursuant to a Plan provision, that if he failed
to attend a rehabilitation program, his benefits would be
terminated. Terry was given a choice among three institutions, and
he opted to attend Farnum Industrial Rehabilitation ("Farnum"). 
Dr. Jacobs eventually signed off on the referral to Farnum, but did
not think the program would be helpful to Terry.
Dr. Robert Haile, the Medical Director at Farnum,
examined Terry upon his entry to the program. Haile opined at the
time that, 
[Terry's] degree of disability . . . appears
to be out of proportion to the degree of
findings in his knee. I believe the patient
has developed chronic pain syndrome, which
refers primarily to the whole person effect of
a chronic painful injury. It involves in
addition to local persistent pain the
psychosocial effects of chronic pain. I think
the patient would be a good candidate for Work
Hardening.

Dr. Haile did not doubt that Terry's pain was genuine. Although
Terry's Farnum experience started out well enough, in the end Terry
had completed fourteen rehabilitation sessions and canceled
thirteen. Terry states that the cancellations were due primarily
to complaints of severe pain, caused by the effort required to
attend and participate in the rehabilitation program. 
At about the same time as he was participating in the
Farnum program, Terry was referred by Tacl to Deborah Veatch, a
local vocational rehabilitation consultant. Although Terry was
initially receptive to Veatch's services, his interest and
participation in her services quickly waned. Veatch eventually
communicated to Tacl that "[b]ased on Mr. Terry's obvious lack of
follow through with treatment and vocational activities, . . . Mr.
Terry is most likely not an appropriate candidate for vocational
rehabilitation services." Veatch did conclude, however, that Terry
possessed transferable skills in the computer field.
On January 20, 1994, Terry was discharged from the Farnum
program. The Program Director, Cheryl Baldwin, reported in the
discharge summary: "Mr. Terry is capable of working full time,
although the amount of standing needs to be limited. He is able to
sit for two to four hours with intermittent stretch breaks. Mr.
Terry is currently at Sedentary-Light duty work capacity. He has
full, unlimited use of his upper body." Tacl thereafter requested
that Dr. Haile complete a Physical Capacities Evaluation. Dr.
Haile did so, and released Terry to full-time work with
restrictions on continuous time in a sitting or standing position,
as well as lifting, bending, and crawling.
Terry received a letter dated February 24, 1994 from Tacl
indicating that she was recommending that his benefits be
terminated. The letter stated that "[b]ecause you have been
released to work with restrictions, you no longer meet the [Plan's]
definition of total disability." Shortly thereafter, Terry
received a termination letter dated March 3, 1994. The letter
stated that, "[d]isability is defined as your complete inability to
work in any job for which you[] are reasonably fitted by education,
training, or experience. Based on a review of the medical and
vocational information in your file you are no longer totally
disabled from performing 'any occupation.'" Terry was advised of
certain of his appeal rights, and benefits were terminated
retroactively to February 25, 1994. Terry's benefit checks were
not continued during the pendency of his appeals. 
Shortly after Terry's termination, Tacl received a letter
from Dr. Haile. Dr. Haile apparently sent the letter after
receiving a phone call from Dr. Jacobs. The Haile letter stated
that Haile had only been a consultant in a work-hardening program,
and if Tacl required a formal "work release," that release would
have to come from Dr. Jacobs. 
Terry requested an appeal from Northwestern's decision. 
The "Northwestern ERISA Committee" was convened, reviewed his
entire file, and upheld the benefits termination. Terry was
advised of this by letter dated March 25, 1994. That letter stated
that "[a]lthough Dr. Jacobs provided us with a detailed historical
account of your problems with knee pain, he did not provide us with
objective evidence to support your total disability from alloccupations, as your LTD plan requires." Terry was informed in the
letter that further requests for appeal should be directed to
Bayer. 
On June 1, 1994, Terry now represented by counsel 
sent a letter to Tacl demanding reinstatement of benefits. Tacl
informed Terry that Bayer would handle any further appeal, and
notified Bayer of the receipt of the latest request from Terry. By
letter dated July 18, 1994, Bayer's Benefits Manager Joyce
Fleischer notified Terry of the steps he needed to take in order to
perfect an appeal before the Bayer Benefit Administration Committee
("Benefit Committee"). Included in that letter was the requirement
that Terry file his appeal within sixty days. A copy of the
relevant appeal procedure from the SPD was appended to Fleischer's
letter. 
It was not until August 15, 1995 over one year later
that Terry formally requested an appeal before the Benefit
Committee. Additional materials were forwarded to Bayer, and
Bayer scheduled a meeting of the Committee to decide the appeal. 
Before the meeting, Bayer requested that Northwestern's ERISA
Committee also review the additional materials forwarded by Terry. 
The Northwestern Committee did so, and again affirmed its decision
to terminate benefits. The Bayer Benefit Committee met on
December 6, 1995, reviewed Terry's file, and voted to uphold the
termination of benefits. 
Terry was advised of the decision by a letter from
Bayer's employee benefits counsel dated December 21, 1995, stating
the Benefit Committee's reasons for upholding the termination. 
First, the Benefit Committee determined that Terry's appeal was
untimely, because it was not filed within the sixty-day time period
provided for in the Plan and communicated to Terry in the letter
from Fleischer. The Committee went on "[a]s a courtesy to
[Terry]", to reach the merits of Terry's appeal. The Benefit
Committee detailed the following.
To assist the Bayer Corporation in making
its determination, our agent, [Northwestern],
has been extensively involved in evaluating
Mr. Terry's medical condition as well as his
ability to return to work. With the approval
of Dr. Jacobs, Mr. Terry was put in a "work
hardening" program which is an approved
rehabilitation program under the terms of the
Plan. During the nine week period of the
program, he attended fourteen sessions,
canceled thirteen sessions and did not
complete the program. On February 1, 1994, at
the end of the program, he was released to
full-time, sedentary work by Dr. Haile. Dr.
Haile was the Medical Director and Physiatrist
specializing in assessment of functional
capacities in the work hardening program. 
Based on Dr. Haile's release, as well as Mr.
Terry's failure to participate to any
meaningful extent in the work hardening
program, the Committee would uphold the
termination of Mr. Terry's benefits under the
Plan even if his appeal was timely filed.

It is also important to note that the
Committee considered the information you
supplied from Dr. Jacobs, Dr. Taylor, the
Social Security Administration and Paul
Blatchford but, as it is permitted to do under
the terms of the Plan, concluded that the
opinions of Dr. Haile and Debbie Veatch, a
vocational expert, were more credible because
those opinions are based on the objective
medical testing performed during the work
hardening program and Mr. Terry's medical
status as of February 1, 1994.

Dr. Jacobs is not a specialist but rather a
generalist who has consistently prescribed
narcotic medications to treat the pain
associated with Mr. Terry's condition but has
not been directly involved in any
rehabilitative course of action for Mr.
Terry's condition. Although Dr. Taylor is a
specialist, his report does not include any
information regarding objective testing
performed on Mr. Terry in determining his
physical capabilities. Also, the information
provided by Dr. Taylor is based on his medical
condition as of July 10, 1995 approximately
seventeen months after his February 1, 1994
release. Similarly, Mr. Blatchford's report
is based on Mr. Terry's medical condition as
of October 20, 1995 approximately 20 months
after his February 1, 1994 release and is
based on subjective medical complaints rather
than objective testing.

Terry filed suit under ERISA in Superior Court, Essex
County, Massachusetts, in February, 1996, alleging that the
benefits termination contravenes the Plan language. The Bayer Plan
removed to federal court, see Metropolitan Life Ins. Co. v. Taylor,
481 U.S. 58, 63-67 (1987), and in due course moved for summary
judgment. The district court, by margin order, granted summary
judgment in defendants' favor on all claims, finding no abuse of
discretion in the benefits termination. This appeal followed. 
Our standard of review over the district court's decision
on summary judgment is de novo. See Vartanian v. Monsanto Co., 131
F.3d 264, 266 (1st Cir. 1997). We are directed to grant summary
judgment where "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has
stated that summary judgment is appropriate "against a party who
fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial." Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986). Here, Terry bears the burden of making
"a showing sufficient to establish" a violation of ERISA, namely,
that the benefit termination was unreasonable.
II.
ERISA is a "comprehensive and reticulated statute,"
Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361
(1980), which governs the rights and responsibilities of parties in
relation to employee pension and welfare plans, see generally New
York State Conference of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co., 514 U.S. 645, 650-51 (1995). This federal
statute includes a cause of action for plan participants, and other
beneficiaries, "to recover benefits due to him [or her] under the
terms of his [or her] plan." 29 U.S.C.A. 1132(a)(1)(B). It is
under this statutory provision that claims, such as this one,
challenging denials and termination of employer-sponsored
disability benefits are brought. 
Although Terry presents his arguments on appeal in a
variety of arrangements, his positions can be effectively stated as
follows. First, Terry posits that this court should review the
decision of Northwestern, as opposed to that of the Bayer Benefit
Committee, in making the determination whether the disability
benefits were wrongfully terminated. Next, Terry argues that,
regardless of which decision we review, that review should not be
conducted pursuant to the abuse of discretion standard adopted by
the district court, but instead should be conducted de novo; in
other words, Terry asks us to undertake an independent review of
the record and decide whether Terry is "disabled" within the
meaning of the Bayer Plan. Finally, Terry urges us to determine
that, regardless of the standard applied, and regardless of the
decision we review, the benefits termination violated ERISA because
(1) Terry received defective notice of termination, and (2) he was,
and is, totally disabled within the meaning of the Plan. We
address each position in turn.
A.
As we have stated, Bayer contracted with a third party,
Northwestern, to provide administrative assistance to the Benefit
Committee. The agreement between Bayer and Northwestern, entitled
"Administrative Services Only Agreement" ("ASO Agreement"),
stipulated that Northwestern was to, among other things,
"[i]nvestigate and process claims . . . [, e]valuate claims for
potential rehabilitation . . . [, and u]pon receipt of the Plan
Sponsor's final decision on claims appeals, make payment or issue
a denial notice in accordance with the Plan Sponsor's decision."
ASO Agreement 1(B)(1). The ASO Agreement specifically disclaimed
any responsibility on Northwestern's part as a Plan Administrator. 
Id. 5(A). The existence of this contractual arrangement between
Northwestern and the Benefit Committee was authorized by the
Benefit Committee's governing guidelines. Miles, Inc. (Bayer)
Administrative Procedures for the Benefit Administration Committee
Art. VII, 2 ("Admin. Proc."). 
Terry's argument that we should review the decision of
Northwestern, and ignore the later decision by the Benefit
Committee, is stated in his brief as follows: "The Plan vests
discretionary authority with Bayer Corporation, the Plan's
fiduciary. Northwestern, however, not Bayer Corp., made the
initial decision to terminate Mr. Terry's benefits. Bayer
delegated only its administrative duties to Northwestern, but
expressly reserved and thereby intentionally withheld any fiduciary
authority from Northwestern." Appellant Br. at 22. Terry argues
that, because the Plan itself did not grant Northwestern any
discretionary authority to interpret the meaning of the plan,
Northwestern's "initial decision" must be considered afresh under
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).
In Firestone, the Supreme Court ended the debate over the
proper standard of review that courts should employ when examining
the out-of-court decisions of plan administrators to deny benefits. 
The Court stated that, "a denial of benefits challenged under
1132(a)(1)(B) is to be reviewed under a de novo standard unless
the benefit plan gives the administrator or fiduciary discretionary
authority to determine eligibility for benefits or to construe the
terms of the plan." Id. Thus, Terry argues that because the Plan
does not grant the decision-maker the necessary authority to
resolve disputes, determinations made by that decision-maker are
reviewed de novo. 
In making his argument, however, Terry ignores the fact
that the decision of Northwestern was but one step in the process. 
It was not the final and binding termination decision. In Terry's
own words, it was the "initial decision." We must focus, as in the
usual case, on the determinations of the final decision-maker,
which was the Bayer Benefit Committee.
"ERISA contemplates actions against an employee benefit
plan and the plan's fiduciaries. With narrow exception, however,
ERISA does not authorize actions against nonfiduciaries of an ERISA
plan." Santana v. Deluxe Corp., 920 F. Supp. 249, 253 (D. Mass.
1996). See Mertens v. Hewitt Assocs., 508 U.S. 248, 262-63 (1993);
Reich v. Rowe, 20 F.3d 25, 29 (1st Cir. 1994) (nonfiduciary
liability limited to those "who commit violations of ERISA or who
are engaged in an 'act or practice' proscribed by the statute"). 
Courts have determined that when the plan administrator retains
discretion to decide disputes, a third party service provider, such
as Northwestern, is not a fiduciary of the plan, and thus not
amenable to a suit under 1132(a)(1)(B). See, e.g., HealthSouth
Rehab. Hosp. v. American Nat'l Red Cross, 101 F.3d 1005, 1008-09
(4th Cir. 1996), cert. denied, 117 S. Ct. 2432 (1997); Harris Trust
& Sav. Bank v. Provident Life & Accident Ins. Co., 57 F.3d 608,
613-14 (7th Cir. 1995); Kyle Rys., Inc. v. Pacific Admin. Servs.,
Inc., 990 F.2d 513, 516 (9th Cir. 1993); Baker v. Big Star Div. of
The Grand Union Co., 893 F.2d 288, 289-90 (11th Cir. 1989). An
interpretive bulletin issued by the Department of Labor bears this
out, stating that an entity which merely processes claims "is not
a fiduciary because such person does not have discretionary
authority or discretionary control respecting management of the
plan." 29 C.F.R. 2509.75-8, D-2 (1997). Thus, "[t]he proper
party defendant in an action concerning ERISA benefits is the party
that controls administration of the plan." Garren v. John Hancock
Mut. Life Ins. Co., 114 F.3d 186, 187 (11th Cir. 1997).
Similarly, as we recognized in Rowe, 20 F.3d at 32, ERISA
itself significantly limits the liability of service providers in
actions under the statute. The Rowe panel refused to exercise its
power to fashion a common law remedy to generally extend "the
threat of liability over the heads of those who only lend
professional services to a plan without exercising any control
over, or transacting with, plan assets." Id. Such liability was
withheld in Rowe in recognition of, inter alia, the fact that it
would likely "deter such [service providers] from helping
fiduciaries navigate the intricate financial and legal thicket of
ERISA." Id.; see also Buckley Dement Inc. v. Travelers Plan
Admins. of Ill., Inc., 39 F.3d 784, 790 (7th Cir. 1994)(approving
of Rowe reasoning). 
Terry is correct when he points out that this line of
cases is concerned with service provider liability, and as such
does not necessarily foreclose the construct he suggests to
review the decision of Northwestern but hold the Plan liable. 
Nevertheless, we find the precedent compelling. We do not think it
supportable or reasonable for a court, when conducting this form of
inquiry, to examine an intermediate step in the internal review
process de novo. After all, we have determined that a prerequisite
to obtaining judicial review under 1132(a)(1)(B) is that the
claimant have exhausted the internal administrative remedies
available to him. Drinkwater v. Metropolitan Life Ins. Co., 846
F.2d 821, 825-26 (1st Cir. 1988). Thus, if Terry had approached
the district court after having received the termination letter
from Northwestern, but prior to his appeal to Bayer, his case would
likely have been dismissed for failure to exhaust the internal
ERISA remedies. See, e.g., Tarr v. State Mut. Life Assur. Co. of
Am., 913 F. Supp. 40, 43-45 (D. Mass. 1996)(relying on Drinkwater). 
It seems an odd proposition to now ignore the results of those
mandated internal administrative remedies, and focus de novo review
on the intermediate step taken by Northwestern. We reject Terry's
argument that we review Northwestern's decision de novo.
Terry argues that the fact that his benefits were
terminated by Northwestern (subject to appeal to Bayer) means that
Northwestern, not Bayer, was the real decision-maker. The balance
of the record, however, convinces us otherwise. The record amply
demonstrates that Bayer and the Committee retained by written
instrument the discretion to decide disputed claims. There is
nothing to suggest that Northwestern was doing anything other than
applying the terms of the Plan as written to Terry's particular
situation. Although it may have been imprudent for Northwestern to
terminate Terry's benefit checks as soon as it made the initial
decision, Terry has not demonstrated that he would not have been
entitled to a back payment of his disability benefits if his appeal
at Bayer were successful. Indeed, the ASO Agreement specifically
requires Northwestern to adhere to the determinations of the
Benefit Committee. Therefore, although we recognize the impression
generated by Northwestern's immediate termination, the remainder of
the record simply does not support the position Terry presses.
Bayer's Benefit Committee was the entity with the power to make,
and is the entity that actually made, the final decision to
terminate Terry's benefits. It is therefore the decision of the
Benefit Committee which we shall review.
B.
We next turn to the proper standard of review to apply in
examining the out-of-court decision of the Benefit Committee. Two
issues need to be addressed in formulating the proper standard of
review. First we determine whether the Plan expressly grants
discretionary authority to the plan administrator to determine a
claimant's eligibility. Firestone, 489 U.S. at 115. Second, we
decide whether the administrator has properly delegated that
discretionary authority to the Benefit Committee. Rodriguez-Abreuv. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir. 1993). 
We address each point in turn.
As we have previously outlined in part A, supra, the
Supreme Court has determined that "a denial of benefits challenged
under 1132(a)(1)(B) is to be reviewed under a de novo standard
unless the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or to
construe the terms of the plan." Firestone, 489 U.S. at 115; see
also Varity Corp. v. Howe, 516 U.S. 489, 513 (1996)("At present,
courts review [plan coverage] decisions with a degree of deference
to the administrator, provided that the benefit plan gives the
administrator or fiduciary discretionary authority . . . .")
(internal quotation marks omitted). 
We have steadfastly applied Firestone to mandate de novo
review of benefits determinations unless "a benefits plan . . .
clearly grant[s] discretionary authority to the administrator." 
Rodriguez-Abreu, 986 F.2d at 583; see also Diaz v. Seafarers Int'l
Union, 13 F.3d 454, 456 (1st Cir. 1994); Allen v. Adage Inc., 967
F.2d 695, 697 (1st Cir. 1992); Bellino v. Schlumberger Techs.,
Inc., 944 F.2d 26, 29 (1st Cir. 1991). Where the clear
discretionary grant is found, "Firestone and its progeny mandate a
deferential arbitrary and capricious standard of judicial review." 
Recupero v. New England Tel. and Tel. Co., 118 F.3d 820, 827 (1st
Cir. 1997) (internal quotation marks omitted).
The record in this case demonstrates that the Plan grants
discretionary authority to the Plan Administrator to make the
necessary judgment calls concerning claimant eligibility. First
the Plan names "The Company" Bayer as Plan Administrator,
before going on to state that,
The Company shall have the exclusive right to
make any finding of fact necessary or
appropriate for any purpose under the Plans
including, but not limited to, the
determination of the eligibility for and the
amount of any benefit payable under the Plans. 
The Company shall have the exclusive
discretionary right to interpret the terms and
provisions of the Plans and to determine any
and all questions arising under the Plans or
in connection with the administration thereof,
including, without limitation, the right to
remedy or resolve possible ambiguities,
inconsistencies, or omissions, by general rule
or particular decision.

Miles Inc. Disability Plans 8.4 ("Plan"). Rodriguez-Abreucounsels that the grant of discretionary authority must be clear. 
986 F.2d at 583. We think the language quoted above admits of no
other interpretation. In Cooke v. Lynn Sand & Stone Co., we
determined that the plan language was insufficient to satisfy
Firestone. 70 F.3d 201, 204 (1st Cir. 1995). There, the plan
language stated only that the administrator had "exclusive control
and authority over administration of the Plan." In contrast,
Bayer's Plan specifically allocates to the Company the right to
find necessary facts, determine eligibility for benefits, and
interpret the terms of the Plan. 
The next step in the process is to determine whether
there has been an effective delegation of that discretionary
authority from the Plan Administrator to the Benefit Committee. 
"ERISA allows named fiduciaries to delegate responsibilities,"
Rodriguez-Abreu, 986 F.2d at 584, by "expressly provid[ing] for
procedures . . . for named fiduciaries to designate persons other
than named fiduciaries to carry out fiduciary responsibilities
(other than trustee responsibilities) under the plan," 29 U.S.C.A.
1105(c)(1)(B). Here, the Bayer Plan states that "The Company may
appoint one or more individuals to act on its behalf, in which case
every reference herein made to the Company shall be deemed to mean
or include the individuals as to matters within their
jurisdiction." Plan 8.3. Bayer took the Plan up on its offer,
and formed the "Benefit Administration Committee" which was
designed to "act on behalf of the Corporation by assisting the
Corporation in fulfilling its administrative duties which are set
forth in the employee benefit plans." Admin. Proc. Art. I, 1. 
Part of the Committee's duties included responsibility for the
initial review of claims (or delegation thereof), and the impartial
review of claim denials. Admin. Proc. Art. VII, 2.
We think this constitutes an effective delegation of
discretionary authority from the Company to the Benefit Committee. 
Our conclusion is supported by the fact that vested within the
Committee, and pursuant to the Plan, was the responsibility to deny
a claim "only if there [was] a reasonable basis for the denial," as
well as the responsibility to "conduct a complete and adequate
review before making a decision upholding the denial of a
claimant's benefit." Id. The Committee had been given the
authority to make "reasonable" decisions, an inherently
discretionary function. In Rodriguez-Abreu, 986 F.2d at 584, we
stated that reliance on "inferences from the circumstances
. . .[was] insufficient to prove delegation of discretionary
authority." No inferences need be drawn where we discern a clear
and direct delegation by written instrument from the Plan
Administrator to the Benefit Committee.
What emerges from the record is that: (i) the Plan
granted Bayer the discretionary authority to interpret and apply
the terms of the Plan; (ii) the Plan authorized Bayer to delegate
duties and authority; and (iii) Bayer delegated the discretionary
authority to review claims and appeals to the Committee. The
decisions of the Committee are, therefore, entitled to deferential
review.
We reject Terry's argument that the "Limitations" clause
of the Administrative Procedures document alters this equation. 
The clause states that "The Committee and its Members . . . shall
not have any independent fiduciary duties under the employee
benefit plans." Admin. Proc. Art. VII, 1. Terry argues that
this means that the Committee had no fiduciary responsibilities
whatsoever, and therefore no discretionary authority attached to
its decisions. This argument, of course, ignores the import of the
word "independent." That the Committee is deemed not to have any
"independent fiduciary duties" does not mean that they have none. 
Rather, we think the most plausible reading of the Limitations
clause is that the Committee's fiduciary responsibilities do not
extend beyond those required to carry out the duties assigned to
it. This conclusion is supported by the very nature of ERISA
fiduciary responsibility. "[F]iduciary status is not an all or
nothing proposition; the statutory language indicates that a person
is a plan fiduciary only 'to the extent' that he possesses or
exercises the requisite discretion and control." Beddall v. State
St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998) (quoting 29
U.S.C. 1002(21)(A)). As a result, the clause has no effect, for
our purposes, on Bayer's delegation to the Committee, and by
extension, no effect on the standard of review to be employed.
C.
Turning to the merits of the case, Terry first argues
that the notice of termination did not comply with ERISA. The
statute specifies that a plan "shall provide adequate notice in
writing to any participant or beneficiary whose claim for benefits
under the plan has been denied, setting forth the specific reasons
for such denial, written in a manner calculated to be understood by
the participant." 29 U.S.C.A. 1133(1). The interpretative
regulations go on to require that the notice contain, 
(1) The specific reasons for the denial; 
(2) Specific reference to pertinent plan
provisions on which the denial is based; 
(3) A description of any additional
material or information necessary for the
claimant to perfect the claim and an
explanation of why such material or
information is necessary; and 
(4) Appropriate information as to the
steps to be taken if the participant or
beneficiary wishes to submit his or her claim
for review.

29 C.F.R. 2560.503-1(f). Terry argues that because neither
Northwestern nor Bayer ever informed him of the specific
documentation or medical reports needed to obtain a favorable
decision, both entities failed to comply with ERISA's notice
requirements.
To be sure, the letters Terry received merely directed
him to forward "any information which may affect the decision to
terminate your claim." Terry therefore argues that, under 29
C.F.R. 2560.503-1(f)(3), supra, he was entitled to a more
detailed description of materials necessary for a successful
appeal. We are not convinced, however, that the regulatory
standard quoted above necessarily requires an administrator (or
agent thereof) to inform Terry of "what additional information Mr.
Terry should include in order to win his appeal." Appellant Br. at
41 (emphasis added). Instead, the regulations mandate that the
administrator describe what is required to "perfect the claim." 
Terry has not convinced us that "perfect the claim" is synonymous
with "win the appeal." Indeed, it would seem to us that in the
instant case, neither Northwestern nor Bayer contended that Terry's
claim was deficient. The decision was simply that the lack of
objective findings, together with the failure to participate more
fully in the work hardening program, did not support a finding of
total disability. Regardless, however, of whether Bayer and
Northwestern failed to comply formally with the regulations, and we
do not imply any such failure, precedent in this circuit and others
is to the effect that ERISA's notice requirements are not meant to
create a system of strict liability for formal notice failures. 
This court has recently concluded "that allowing a claim
for relief because of inadequacy of formal notice without any
showing that a precisely correct form of notice would have made a
difference would result in benefit claims outcomes inconsistent
with ERISA aims of providing secure funding of employee benefit
plans." Recupero, 118 F.3d at 840. Similarly, the Seventh Circuit
has stated:
Not all procedural defects . . . will upset a
fiduciary's decision. Substantial compliance
with the regulations is sufficient. In
determining whether there has been substantial
compliance, the purpose of 29 U.S.C. 1133
and its implementing regulations, 29 C.F.R.
2560.503-1(f), serves as our guide: "was the
beneficiary supplied with a statement of
reasons that, under the circumstances of the
case, permitted a sufficiently clear
understanding of the administrator's position
to permit effective review."

Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 382 (7th Cir.
1994)(citations omitted)(quoting Halpin v. W.W. Grainger, Inc., 962
F.2d 685, 690 (7th Cir. 1992)). 
The record reveals that Terry was, in fact, "permitted a
sufficiently clear understanding of the administrator's position to
permit effective review." Id. He submitted additional medical and
vocational information to the Benefit Committee which directly
addressed the question whether he was disabled from performing
"any" job. His actions demonstrate that he was well aware of the
reasons for the decision, and was submitting additional evidence on
the crucial point. Moreover, he was on notice that a critical
issue was the lack of objective medical testing in support of his
claim, having been informed of that deficiency in the letter from
Northwestern's ERISA Committee. Finally, he has failed to
demonstrate the prejudice that Recupero requires. Terry has not
presented any evidence that implies that a different outcome would
have resulted had the notice been in formal compliance with the
regulations. As a result, Terry has not shown that the alleged
defect abridged his right to "a full and fair review by the
appropriate . . . fiduciary." 29 U.S.C.A. 1133(2). 
We now turn to the heart of this appeal, and determine
whether the decision of the Benefit Committee was arbitrary and
capricious. It is, of course, the hallmark of such review that "a
court is not to substitute its judgment for that of the [decision-
maker]." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.
Co., 463 U.S. 29, 43 (1983). Rather, in the ERISA context, it has
been stated that under the arbitrary and capricious standard, "a
fiduciary's interpretation of a plan will not be disturbed if
reasonable." DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 520
(3d Cir. 1997).
The Benefit Committee gave two reasons for its decision
to uphold the termination of benefits. The first was that Terry
had failed to perfect his appeal within the proper sixty-day time
limit. The second was that Terry no longer met the Plan's
definition of disability. Terry fails to present evidence to
demonstrate that either decision was unreasonable.
It was not improper for the Benefit Committee to have
held Terry to the sixty-day appeal period. Drinkwater mandates
that a claimant must have exhausted the plan's administrative
remedies before bringing suit to recover benefits. 846 F.2d at
825-26. This court is not alone in so holding. See, e.g.,
Communications Workers of Am. v. AT&T, 40 F.3d 426, 431-34 (D.C.
Cir. 1994); Makar v. Health Care Corp., 872 F.2d 80, 82-83 (4th
Cir. 1989); Amato v. Bernard, 618 F.2d 559, 566-68 (9th Cir. 1980). 
A claimant is required to attend to the plan's internal appeal
process first, unless "the administrative route is futile or the
remedy inadequate." Drinkwater, 846 F.2d at 826 (quoting Amato,
supra). Terry has not attempted to make any showing of futility or
inadequacy. 
We have not yet had the opportunity to apply the
Drinkwater exhaustion requirement to the situation here where a
claimant files an appeal, but does so late. In such a circumstance
the claimant, while ostensibly availing himself of the internal
review process, has procedurally defaulted as a result of the late
filing. The same principles which inform the ERISA exhaustion
requirement also counsel that part of that internal administrative
process includes the responsibility on the claimant's part to file
appeals in a timely fashion. Cf. Counts v. American Gen. Life and
Acc. Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997) (observing that
attorney's letters contesting aspects of benefit denial sent four
and ten months after sixty-day appeal period expired constitutes
failure to exhaust administrative remedies). As the Fourth Circuit
reasoned in Makar,
Congress' apparent intent in mandating these
internal claims procedures was to minimize the
number of frivolous ERISA lawsuits; promote
the consistent treatment of benefit claims;
provide a nonadversarial dispute resolution
process; and decrease the cost and time of
claims settlement. It would be anomalous if
the same reasons which led Congress to require
plans to provide remedies for ERISA claimants
did not lead courts to see that those remedies
are regularly utilized.

872 F.2d at 83 (quotation marks and citations omitted). It would
hardly make sense to permit the filing of an appeal over one year
late in light of the internal claims procedures' aims of
consistency and economy. Haphazard waiver of time limits would
increase the probability of inconsistent results where one claimant
is held to the limitation, and another is not. Similarly,
permitting appeals well after the time for them has passed can only
increase the cost and time of the settlement process. 
This would be, of course, a different case if Terry's
procedural default was caused by improprieties on the part of the
Plan. Instead, Terry's lapse was egregious because Bayer's
Benefits Manager, Ms. Fleischer, took affirmative steps to inform
Terry of exactly how to pursue an appeal. A letter was sent to
Terry which informed him of the sixty-day time period, appended to
which was a copy of the relevant appeal provisions from the SPD. 
Yet Terry did not bother to request an appeal until over one year
later, despite the fact that he was represented by counsel at the
time the Fleischer letter was received. We therefore do not think
it unreasonable for the Benefit Committee to have denied Terry's
appeal on the basis that it was not filed on time. 
Nor do we think the Benefit Committee would have been
unreasonable if its sole basis for rejecting the appeal was that
Terry was no longer unable to perform "any job for which [Terry
was] qualified by education, training, or experience." There was
evidence before the Committee that: (i) several doctors (including
Dr. Jacobs) had at various times determined that Terry could
perform either part-time or full-time sedentary work; (ii) Terry
was trained to be a computer technician; (iii) Terry possessed
transferable skills in the computer field; and (iv) based on
observations at Farnum (the rehabilitation center), Terry was
capable of working full time, so long as his job did not entail
certain physical tasks, and he was permitted accommodations to
alleviate his knee pain. We also note that Terry failed to
participate fully in the work hardening program. On such a record,
we think it to be a reasonable interpretation to say that Terry was
no longer precluded from performing "any job," as the Plan
requires. After all, Terry was trained and experienced in computer
technology and software, which can be readily adapted to a
sedentary worker's needs. That there were contradictory opinions
before the Committee does not render the Committee's decision
arbitrary or capricious. The Benefit Committee was charged with
the duty of resolving disputes concerning claimant eligibility, and
their determination in this regard is supported by substantial
evidence. See Miller v. United Welfare Fund, 72 F.3d 1066, 1072
(2d Cir. 1995)(noting that decision unsupported by substantial
evidence would be arbitrary and capricious). 
Finally, Terry asserts that he was "set up" by
Northwestern in that Northwestern forced him into a rehabilitation
program that was designed to result in a release to work 
regardless of his capacity to do so. Thus, the argument goes, the
record relied upon by the Benefit Committee (and generated by this
"set up") was unreasonably biased against him, and as such failed
to afford him an impartial appeal. We fail to see the evidentiary
basis for the argument. Our review of the record reveals only
good-faith efforts to determine whether Terry continued to meet the
Plan's definition of disability. The record discloses that Tacl
decided upon the rehabilitation course only after being confronted
with conflicting medical opinions concerning the extent of Terry's
disability. Both the IME and the rehabilitation program were
specifically authorized by Plan documents. See SPD at 11. There
is nothing in the record to suggest that the Farnum program was a
sham. We therefore do not think Terry has adduced sufficient
evidence on this argument to survive summary judgment. 
On the record before us, we cannot say that the decision
of the Benefit Committee to uphold the termination of Terry's long-
term disability benefits constitutes an arbitrary or capricious
decision. As a result, summary judgment was properly entered
against Terry.
For the reasons stated, the decision of the district
court is affirmed. Costs awarded to appellee.